OPINION
Appellant, Kevin Neal, is appealing the judgment of the Champaign County Common Pleas Court which found him guilty of two counts of aggravated murder, four counts of abuse of a corpse, and one count of tampering with the evidence.
In July of 1997, Appellant was married to Sue Neal and lived in Champaign County, Ohio. Sue Neal had three children from two different fathers: India Smith, age 11, and Britney Smith, age 10, whose father was Ricky Smith, and Cody Smith McGraw, age 4, whose father was Gary McGraw.[1] Sue Neal had custody of Cody but did not have custody of India and Britney, although they visited often.
For a period of time, Appellant and Sue Neal had been having marital difficulties arising out of their mutual infidelities. Appellant had been incarcerated in May of 1997 and had been informed while incarcerated of an instance of Sue Neal's infidelity, at which time he stated, "how you get, how you hurt somebody is you get even with them by hurting someone that they love." On July 9, 1997, India was visiting with Appellant and Sue Neal, but Britney was not. On the morning of July 9, 1997, Appellant and Sue Neal again had a fight and Sue Neal had stated that she either wanted Appellant to leave the house or she and Cody would move out of the house. Sue Neal then went to work and left India and Cody in the care of Appellant.
At 1:52 p.m. Appellant called 911 to report that India and Cody, who he stated had been playing outside, had disappeared. He told the dispatcher that he had been looking and hollering for them for about 30-40 minutes. Appellant stated that he was afraid to call his wife because he was afraid she would blame him and asked the dispatcher to call Sue Neal. Police officers arrived at the Neals' residence shortly after 2:00 p.m. and began questioning Appellant and searching the house and grounds. Along with other vehicles, a maroon or burgundy Bonneville was parked in front of the garage. Appellant told the police officers that the Bonneville had not run in over a month and there was no use in checking it.
Shortly thereafter, Sue Neal raced into the driveway, clearly agitated and angry. Sue Neal jumped from the car and charged Appellant, stating, "Kevin, what the fuck have you done with my kids?" After an officer forced her back in her car, she again screamed, "What the fuck did you do to my kids?"
Over the course of the next day, the police repeatedly interviewed both Appellant and Sue Neal. Appellant told the police that he had been doing housework on the morning of July 9, 1997 and that the children had been playing in the yard. Appellant stated that he could hear the children playing despite having the stereo on because the windows and back door were open. Appellant stated that he heard no car doors or screams. However, Appellant stated that it was common for cars to come in and out of the driveway because the owner of the property stored things there. Appellant further stated that he thought India was too responsible to have walked away or to have gotten in a car with a stranger.
From July 23, 1997 onwards, Appellant was in prison in Indiana. On August 2, 1997, police officers again searched the Neals' residence but found only Cody's shoes in a trash pile behind the residence. The shoes had not been found during previous searches of the residence, including canine searches on July 9-11, 1997. Appellant identified the shoes as the shoes he had put on Cody the morning of July 9, 1997.
On September 6, 1997, a farmer, who was mowing his hay about eight miles from the Neals' residence, discovered the naked bodies of India and Cody. The bodies were located in weeds and overgrowth near Nettle Creek Cemetery, which was next to the farmer's field. The farmer found the bodies because he smelled something dead and went to investigate. It was later determined that the bodies were lying less than a hundred feet from the grave of Sue Neal's mother. The coroner was unable to determine an exact cause of death but could only say the deaths were due to "undetermined homicidal violence."
On May 20, 1999, Appellant was indicted on 11 counts which allegedly occurred on or about July 9, 1997 and stemmed from the disappearance and murder of India and Cody. Initially, Appellant was indicted on four counts of capital murder each with six specifications. The following three of these specifications on each count made Appellant eligible for the death sentence: the offenses were committed to escape detection, they were part of a course of conduct involving the purposeful killing of two or more persons, and the offenses were committed in association with a kidnapping. Also, Appellant was charged with two counts of kidnapping and four counts of abuse of a corpse, two of which were misdemeanors and two of which were felonies. Finally, Appellant was charged with tampering with evidence. Based on a Crim. R. 29 motion by Appellant, the trial court dismissed the kidnapping count, the kidnapping and escaping detection specifications, and two of the aggravated murder counts which were for murder committed in association with a kidnapping. Therefore, the only counts and specifications which went to the jury were two counts of prior calculation and design aggravated murder, each with a course of conduct specification attached, four counts of abusing a corpse; and one count of tampering with evidence.
At trial, Appellant's sister testified that the day after the children disappeared, Appellant stated, "* * * I might as well just confess so all this will stop and get it over with. The only thing I'm afraid of is the death penalty." However, on cross-examination, she stated that Appellant had said, "I should just go ahead and give them what they want, confess so [Sue] doesn't have to go through this." Also, she testified he stated, "[M]aybe this will all stop. It will stop. Sue and you won't have to go through this no more." Appellant's aunt testified that he stated to her that he had really done something terrible and guessed that he might as well do away with himself. Additionally, Appellant's mother testified that on one occasion after having consumed a significant amount of alcohol, Appellant stated that he took the whole blame for the children's disappearance and wanted to kill himself. However, she additionally testified that Appellant repeatedly denied having anything to do with the children's disappearance and stated that "harming the kids would be like hurting his wife" and that "he couldn't do nothing like that for he couldn't hurt his Susie."
At trial, two farmhands, who visited one of the farm buildings situated on the same property where the house that the Neals rented on July 9, 1997 was situated, testified. They testified that they visited the property for 30-40 minutes beginning at approximately 1:00 or 1:05 p.m., yet the farmhands stated that they neither saw the children nor heard Appellant yelling for them as he claimed. The farmhands further stated that they saw the Neals' station wagon along with a small blue hatch back car parked in front of the garage but that they had not seen the maroon Bonneville. The State further presented evidence that despite Appellant's claim that the Bonneville's brakes were not working, the car could be used. Yet, no evidence relating to the disappearance or murder of the children was ever found in the Bonneville.
Additionally, the State presented evidence of two bloodstains, one of which could have come from India, on the master bedroom comforter. Appellant had stated that India fell asleep on the couch and he told her to sleep in the master bedroom because he needed to clean the house. However, it was also revealed that India had started her menstrual cycle.
The State also found Kentucky Bluegrass seeds and Catchweed Bedstraw seeds on a blue blanket in Cody's room. The police found immature Kentucky Bluegrass seeds in the pocket of Appellant's jeans. The State presented evidence that both types of seeds could be found at the Nettle Creek Cemetery. There was conflicting expert testimony regarding whether the seeds were also present at the Neals' residence in 1997.
An expert for the State testified that he estimated the time of death between July 9 and 14, 1997. The expert based his decision on the conditions of the bodies and the insect activity therein. However, the defense presented an expert which stated that the time of death could not be concluded from the data. Also, a defense expert testified that the smell from a dead body can be smelled from 30 yards away beginning the first two to three days after death. Further, the expert testified that the smell increases in the first three weeks after death and then starts to decrease three to four weeks after death. The defense expert opined that at two months after the death, one would have to be very close to the body in order to smell it. The defense also presented the testimony of a man who had walked in the cemetery four days after the children's disappearance, who had not reported smelling anything. Also, the farmer, who eventually discovered the body while mowing, stated that he had previously mowed the field, and raked and baled hay at the end of July of 1997 and had not noticed the smell. Defense argued from this that India and Cody could have only been dead one month, which would exclude Appellant as the killer because he had been in prison at that time. Similarly, the State's experts differed on whether any liver remains existed in the children when they were found in September. The presence of liver remains would indicate only three to four weeks would have passed since the children's death. Finally, the defense presented witnesses who testified that they saw the children in Greenville, Ohio on July 9, 1997, the day they disappeared.
The jury returned a guilty verdict on two counts of aggravated murder, four counts of abuse of a corpse, and one count of tampering with evidence. As this was a capital case, the trial court proceeded on to the mitigation phase of the trial on May 31, 2000 and the jury recommended that Appellant should receive life in prison without the possibility of parole rather than the death penalty. The court imposed on Appellant two terms of life imprisonment without the possibility of parole and sentenced him to 12 months each on the two felony abuse of a corpse counts, to two months each on the two misdemeanor abuse of a corpse counts, and to five years for tampering with evidence. The two counts for misdemeanor abuse of a corpse crimes were to be served concurrent to each other and to all other counts. The remaining sentences were to be served consecutively. Appellant timely filed his notice of appeal from this judgment.
On June 16, 2000, Appellant filed two motions for a new trial. The trial court denied both motions without holding a hearing on July 25, 2000. Appellant filed his notice of appeal from the denial of the motions for a new trial. This court has consolidated Appellant's two appeals solely for the purpose of this appeal.
Appellant raises the following six original assignments of error:
 "1. MR. NEAL'S RIGHTS TO DUE PROCESS, A FAIR TRIAL, AND AN IMPARTIAL JURY WERE VIOLATED. SIXTH AMENDMENT AND SECTION 1, FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION; SECTIONS 5 AND 16, ARTICLE I, OHIO CONSTITUTION.
 "2. TRIAL COUNSEL WAS INEFFECTIVE IN FAILING TO OBJECT TO INADMISSIBLE AND IRRELEVANT OPINION EVIDENCE. THIS VIOLATED THE DUE PROCESS CLAUSE OF SECTION 1, FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION; THE RIGHTS TO EFFECTIVE ASSISTANCE OF COUNSEL AND TO CONFRONT WITNESSES GUARANTEED BY THE SIXTH AMENDMENT TO THE UNITES STATES CONSTITUTION; SECTIONS 10 AND 16, ARTICLE I OF THE OHIO CONSTITUTION; AND EVID. R. 401, 402, 701.
 "3. THE TRIAL COURT ERRED IN ADMITTING EVIDENCE THAT MR. NEAL HAD INVOKED HIS RIGHT TO COUNSEL. THIS VIOLATED THE DUE PROCESS CLAUSE OF SECTION 1, FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION, AND SECTION 16, ARTICLE I OF THE OHIO CONSTITUTION.
 "4. THE TRIAL COURT ERRED IN ALLOWING THE ADMISSION OF INADMISSIBLE HEARSAY. THIS VIOLATED THE DUE PROCESS CLAUSE OF SECTION 1, FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION; THE RIGHT TO CONFRONT WITNESSES GUARANTEED BY THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION; AND EVID. R. 802.
 "5. THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING THE MOTIONS FOR NEW TRIAL. THIS VIOLATED THE DUE PROCESS CLAUSE OF SECTION 1, FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION; SECTION 16, ARTICLE I
OF THE OHIO CONSTITUTION; AND CRIM. R. 33.
 "6. THE TRIAL COURT ERRED IN PERMITTING THE JURY'S GUILTY VERDICT, WHICH WAS BOTH AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND BASED ON INSUFFICIENT EVIDENCE. DUE PROCESS CLAUSE, FOURTEENTH AMENDMENT, UNITED STATES CONSTITUTION; SECTION 16, ARTICLE I AND SECTION 3(B)(3), ARTICLE IV, OHIO CONSTITUTION; R.C. 2901.05(A)."
Additionally, Appellant raises the following four supplemental assignments of error:
 "1. THE TRIAL COURT'S VIOLATION OF FORMER OHIO CRIM. R. 24(F), AND THE COURT'S PERMITTING THE PRESENCE OF AN ALTERNATE JUROR DURING THE JURY'S DELIBERATIONS DENIED MR. NEAL HIS DUE PROCESS RIGHTS TO A FAIR TRIAL, A JURY TRIAL, AND TO THE EQUAL PROTECTION OF THE LAWS. FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION; SECTIONS 2, 5, 10, AND 16, ARTICLE I, OHIO CONSTITUTION.
 "2. MR. NEAL WAS DENIED HIS STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO EFFECTIVE ASSISTANCE OF COUNSEL AND A FAIR AND IMPARTIAL JURY WHEN TRIAL COUNSEL FAILED TO CHALLENGE FOR CAUSE A JUROR WHO ADMITTED IN VOIR DIRE THAT SHE BELIEVED MR. NEAL TO BE GUILTY. FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION; SECTIONS 5, 10, AND 16, ARTICLE I, OHIO CONSTITUTION.
 "3. THE TRIAL COURT MADE ERRONEOUS EVIDENTIARY DECISION THROUGHOUT THE TRIAL IN VIOLATION OF MR. NEAL'S SUBSTANTIVE RIGHTS. FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION; SECTIONS 2, 5, 10, AND 16, ARTICLE I, OHIO CONSTITUTION; EVID. R. 401, 402, 403, 703, 802 AND 803.
 "4. THE CUMULATIVE EFFECT OF TRIAL ERROR RENDERED MR. NEAL'S CAPITAL TRIAL UNFAIR AND ENTITLES HIM TO A NEW TRIAL. FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS, U.S. CONSTITUTION; SECTIONS 5 AND 16, ARTICLE I, OHIO CONSTITUTION."
 Appellant's first assignment of error:
 Appellant argues that he did not receive an impartial jury because the trial court denied his motion for change of venue and failed to disqualify certain jurors. We disagree.
a. Change of venue
The determination whether or not to order a change in venue lies within the sound discretion of the trial court. State v. Gumm, 73 Ohio St.3d 413,430, 1995-Ohio-24. An appellate court will not reverse a trial court's judgment on a change of venue motion absent a clear abuse of discretion. Id. An abuse of discretion occurs when a trial court acts in a manner which is unreasonable, arbitrary, or unconscionable. State v. Montgomery
(1991), 61 Ohio St.3d 410, 413.
The mere fact that there was extensive pretrial publicity does not require a change of venue under Crim. R. 18. State v. Treesh,90 Ohio St.3d 460, 463, 2001-Ohio-4. A reviewing court must examine a trial court's denial of a request for change of venue to determine whether a defendant's right to a fair trial was violated. State v.Lundgren, 73 Ohio St.3d 474, 1995-Ohio-227. A fair trial merely requires a panel of impartial, indifferent jurors. Id. at 479. "[U]nless a juror is challenged for cause, he or she is presumed to be impartial." Statev. Williams, 79 Ohio St.3d 1, 4, 1997-Ohio-407. The best test of whether prejudicial pretrial publicity prevented obtaining a fair and impartial jury is a careful and searching voir dire. Treesh, supra at 463-64. Also, a trial court judge must make a good faith effort to seat a jury before granting a change in venue. State v. Fox, 69 Ohio St.3d 183, 189,1994-Ohio-513. Where all the empaneled jurors either have not been exposed to pretrial publicity, or have not formed an opinion, or stated that they could set aside any opinion they had formed, and further where all state that they could render a fair and impartial verdict based on the law and the evidence, it is not error for the trial judge to deny a motion for a change of venue. Treesh, supra at 464.
In selecting a jury for Appellant's trial, 500 potential jurors were summoned and sent preliminary questionnaires. After several jurors were excused, the remaining jurors completed a detailed questionnaire. The trial court voir dired in person 55 potential jurors. The trial judge questioned each prospective juror and each juror was voir dired outside of the presence of the remaining jurors on the issues of pretrial publicity and attitudes about the death penalty.
Appellant complains about four specific jurors: Brenda Flynn, Judy Lattimer, Brenda Cook, and Cynthia Rosales. Appellant complains that Ms. Cook knew that Appellant had charges in Indiana for something and thought that they might be sexual in nature. However, Appellant failed to challenge Ms. Cook for cause. Additionally, Ms. Cook indicated that she had no preconceived notions about the trial and that she would set aside any previous information she thought she knew. (Tr. Vol. 7, 1753-55). Also, Appellant did not challenge Ms. Rosales for cause. Ms. Rosales stated that she believed Appellant was guilty and that sitting in the court room that day that she thought Appellant was guilty. However, Ms. Rosales continued on to state, under oath, that she would be fair and impartial and that she could set aside her belief of guilt and any information she had received from media reports. (Tr. Vol. 8, 1847-48).
As for Ms. Lattimer and Ms. Flynn, both were extensively questioned regarding their exposure to pretrial publicity. Both Ms. Flynn and Ms. Lattimer had the common knowledge that the children had been missing, then found dead, and that Appellant had been accused. Additionally, Ms. Lattimer knew that Appellant had been on trial in another state but mistakenly believed this involved his mother or stepmother. Further, she stated that she had never expressed that she believed Appellant to be guilty but that she had heard others say so. Similarly, Ms. Flynn stated that she knew that Appellant had been on trial in another state and mistakenly thought it concerned his stepmother and some violence. Ms. Flynn was inaccurately mixing two separate events, but she stated that she had no details in her mind about these incidents. Also, Ms. Flynn stated that a fellow employee had told her that he believed Appellant was responsible. However, both Ms. Flynn and Ms. Lattimer took an express oath that they would be fair and impartial, that they had not formed an opinion as to guilt, and that they could set aside any information received from an out of court source, and base their decisions solely on what was presented in court. (Tr. Vol. 5, 1080-81; Vol. 7, 1609-11). We do not find that Appellant has demonstrated juror bias because each juror was specifically questioned regarding his or her individual responses and each juror swore that he or she could set aside all information previously heard and render a fair and impartial verdict. The trial court did not err in overruling Appellant's motion for change of venue.
b. Challenges for Cause on Jurors Lattimer and Flynn
An appellate court should only reverse a trial court's determination not to disqualify a juror on a challenge for bias if it finds that the trial court abused its discretion. Berk v. Matthews (1990),53 Ohio St.3d 161. The trial court is in the best position to hear the prospective juror and to validate the juror's statements. State v.Murphy, 91 Ohio St.3d 516, 526, 2001-Ohio-112 (holding that juror could serve on a jury even though his cousin had been killed by a similar crime and who hesitated before stating that his cousin's death would not affect his impartiality). "A prospective juror is not automatically disqualified by the fact that a close relative has been the victim of a crime similar to the crime on trial." Id. at 25. The trial court must make a determination on a case by case basis of whether the juror has a state of mind evincing enmity or bias. Id.
Appellant reiterates his argument that Ms. Flynn and Ms. Lattimer should have been stricken on the basis of pre-trial publicity, which was discussed above. Appellant also argues that the challenge against Ms. Lattimer should have been granted because her daughter, who was approximately the same age as Cody, had been sexually molested by a family member and, in a separate incident, her aunt, uncle, and five year old cousin had been murdered. Appellant argues that Ms. Lattimer could not have set aside these emotional factors in her background.
The State asserts Ms. Lattimer stated that although she had been close to her uncle and aunt, she had only met the mother of the five year old cousin once and had minimal contact with them. She had only heard a little about the murder proceedings, where the killer pleaded guilty. Although she stated that she had some concern about the length of sentence the killer received, nothing in her testimony indicated that she held enmity towards murderers. As to the molestation of her daughter, Ms. Lattimer did not discover the molestation until her daughter told her when she was an adult. Further, Ms. Lattimer's daughter decided not to do anything about the molestation. By the time of Appellant's trial, these were ancient events in Ms. Lattimer's life and her emotions were likely not as strong as if she had just discovered the abuse of her small child. Moreover, Ms. Lattimer expressly stated that neither event would impair or influence her thinking as a juror on this case. (Tr. Vol. 4, 880-81). Additionally, Ms. Lattimer swore under oath that she had no preconceived notions about how the case should resolve and that she could be fair and impartial. (Tr. Vol. 4, 882). We find that Ms. Lattimer's family history was even less troubling than the juror in Murphy and, like in Murphy, Ms. Lattimer stated her family history would not affect her impartiality. Ms. Lattimer's testimony does not reveal that her state of mind evinced an attitude of enmity or bias. We cannot say that the trial court abused its discretion in overruling Appellant's challenges for cause to Ms. Lattimer or Ms. Flynn. Appellant's first assignment of error is overruled.
Appellant's second assignment of error:
 Appellant asserts that he was denied effective assistance of counsel because his counsel failed to object to the admission of an out of court statement by Sue Neal. We disagree.
We evaluate ineffective assistance of counsel arguments in light of the two prong analysis set forth in Strickland v. Washington (1984),466 U.S. 668, 104 S.Ct. 2052. Trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. See id. at 2064-65. To reverse a conviction based on ineffective assistance of counsel, it must be demonstrated that trial counsel's conduct fell below an objective standard of reasonableness and that his errors were serious enough to create a reasonable probability that, but for the errors, the result of the trial would have been different. See id. at 2064. Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel. See id. at 2065.
In order to constitute hearsay, a statement must be "offered into evidence to prove the truth of the matter asserted." Evid. R. 801. If the statement is offered for another purpose, such as to show animosity between a victim and co-conspirators, the statement is not hearsay and is admissible. State v. Smith, 87 Ohio St.3d 424, 433, 2000-Ohio-450.
At trial, Sargent Stroud described Sue Neal's arrival at her home after having been called by Detective Copeland and told that her children were missing. Sue Neal rapidly pulled up within 10-15 feet of the porch where Appellant and a police officer were standing. Sue Neal immediately jumped out of her car and ran toward Appellant, shouting "Kevin, what the fuck have you done with my kids?" Sgt. Stroud subdued Sue Neal and placed her back in her car, whereupon she leaned out the window and screamed, "Kevin, what the fuck did you do to my kids?" Appellant's trial counsel did not object or request that the statement be stricken.
Appellant argues that this testimony by Sgt. Stroud was impermissible hearsay and that his counsel was ineffective for failing to object to it. However, the State argues that Sue Neal's statement was not offered for the truth of the matter asserted, specifically that Sue Neal knew that Appellant had caused her children's disappearance, but to show the poor relationship between Sue Neal and Appellant. We agree. The State argued at trial that Appellant's motive for killing India and Cody was to hurt Sue Neal for being unfaithful to Appellant during their marriage. Additionally, the State had offered evidence that Appellant and Sue Neal had fought that morning regarding their mutual infidelities. Therefore, it was relevant for the State to show that the relationship between Appellant and Sue Neal was filled with animosity at the time of the children's disappearance. Since the statement was not offered for the truth of the matter asserted, the statement was not hearsay and Appellant's counsel was not ineffective for failing to object to it. Appellant's second assignment of error is without merit and is overruled.
Appellant's third assignment of error:
 Appellant argues that the trial court erred in admitting evidence that he had invoked his right to counsel. We disagree.
An individual's right to due process under the Fourteenth Amendment to the United States Constitution is violated when the individual's invocation of his right to remain silent is used to imply proof of guilt. Doyle v. Ohio (1976), 426 U.S. 610, 619. Testimony that the defendant asked for an attorney when made only to indicate what occurred at the time, without further use by the prosecutor in argument or where the comment was mentioned only briefly, has been held not to be error or only harmless error. State v. Gunn (Aug. 7, 1998), Montgomery, App. No. 16617; State v. Lanier (Aug. 2, 1996), Ottawa App. No. OT-95-051.
If a suspect in a criminal investigation requests counsel at any point during an interrogation, the interrogation cannot continue until a lawyer is provided or the suspect reinitiates the interrogation. State v.Henness, 79 Ohio St.3d 53, 63, 1997-Ohio-405. However, invoking the right to counsel minimally requires a statement that can be reasonably construed as requesting an attorney's assistance. Id. The police officer need not cease questioning if the statement is ambiguous or equivocal such that a reasonable police officer might only have understood that the suspect might be invoking his right to counsel. Id. For example, the statements, "[m]aybe I should talk to a lawyer," or "I think I need a lawyer," have been held to be insufficient to invoke the right to counsel. Davis v. United States (1994), 512 U.S. 452, 461; Henness, supra, 79 Ohio St.3d at 63.
At trial, Special Agent Robert Beedy of the Ohio Attorney General's office testified regarding an interview he conducted of Appellant with some officers with the Champaign County Sheriff's office. At the interview, Appellant was given his Miranda rights, which he waived. However, Mr. Beedy testified that as the interview became more intense Appellant stated, "* * * Well, then I probably ought to talk to an attorney * * *" and then he left the interview. (Tr. 3226-27). Appellant argues that this testimony by Agent Beedy was an impermissible use of Appellant's invocation of his right to counsel used to imply proof of guilt. We first note that Appellant's statement was not an invocation of his right to counsel. We find the statement "I probably ought to talk to an attorney" to be similar to "I think I need a lawyer," which theHenness court held was not an invocation of the right to counsel. Since Appellant's statement was not an invocation of the right to counsel, Agent Beedy's reiteration of the statement was not a comment on Appellant's exercise of a constitutional right. Moreover, as in Gunn and Lanier, Agent Beedy was simply relating why the interview ended, not intending to impeach Appellant or suggest his guilt. The admission of this testimony was not error and Appellant's third assignment of error is without merit and is overruled.
Appellant's fourth assignment of error:
 Appellant argues that several statements which were admitted at trial were hearsay and thus, that the trial court erred in admitting them. We disagree.
Evid. R. 801(C) defines hearsay as "a statement, other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted." Further, Evid. R. 801(A) defines a statement as either "(1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by him as an assertion." Evidence offered to explain an officer's conduct during an investigation is not hearsay and the statements are not offered to prove the truth of the matter asserted. State v. Lynn (2000), 137 Ohio App.3d 402, 406.
Appellant first argues that the testimony of an FBI agent regarding his investigation into some witness accounts that Cody and India had been seen in a store in Greenville, Ohio on July 9, 1997 is hearsay. The FBI agent stated, "The information that was provided to me in which I talked to Sue Neal about specifically was about what the children in the store picked up, as to the items that they liked, and they did not seem to correspond with what they would normally go after." (Tr. 3344). The State argues that the testimony was offered to explain why the police determined that the witness identification of the children in Greenville was not reliable, not to prove the truth of the matter asserted. We agree. The testimony does not relate a specific out of court statement by Sue Neal, but merely that the items chosen by the children in the Greenville store were not consistent with what India and Cody would have normally chosen. Since this testimony was not offered to prove the truth of the matter asserted but instead to explain the actions of the police officers during the investigation, we find that this statement was not hearsay and the trial court did not err in admitting the statement.
Appellant also argues that the trial court erred in admitting testimony by the Sheriff that safety precautions were taken at the Neals' residence as a result of officers expressing concerns for their safety regarding Appellant and a situation at the residence. (Tr. 3433-34). The State asserts that this was also not hearsay because it was offered solely to explain why the Sheriff's department took extra precautions for the safety of all involved. We agree. We cannot find that this is an out of court statement offered for the truth of the matter asserted. This testimony also does not amount to hearsay.
Finally, Appellant argues that the trial court erred in admitting hearsay testimony by the Sheriff that as a result of his investigation he learned that the grave of Sue Neal's mother was 94 feet from the spot where the children's bodies were found. (Tr. 3442). In order to be hearsay, the testimony must contain an out of court statement. In looking at the testimony of the Sheriff, we cannot find an out of court statement. The Sheriff merely stated what he learned as a result of his investigation. He related no statement made to him and in fact did not state how he learned where Sue Neal's mother was buried. As there was no out of court statement related in the Sheriff's testimony about the grave of Sue Neal's mother, the testimony was not hearsay and it was not error to admit it. Appellant's fourth assignment of error is without merit and is overruled.
Appellant's fifth assignment of error:
 Appellant argues that the trial court erred in overruling his motion for a new trial based on affidavits which assert that Mr. Hawkins lied at Appellant's trial. We disagree.
In order to obtain a new trial based on newly discovered evidence, the Ohio Supreme Court has held that the defendant must show:
 "[T]hat the new evidence (1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence." State v. Petro (1947), 148 Ohio St. 505.
The trial judge in considering the Petro factors must determine "whether the newly discovered evidence would create a strong probability of a different result," or "whether it is likely that the jury would have reached a different verdict if it had considered the newly discovered evidence." City of Dayton v. Martin (1987), 43 Ohio App.3d 87, 90. A trial court's decision on a motion for a new trial is within the trial court's competence and discretion and absent a clear showing of abuse, the decision will not be disturbed. State v. Shepard (1983),13 Ohio App.3d 117, 119.
In his motion for a new trial, Appellant presented the affidavit of two persons who were prisoners in jail with Mr. Hawkins, who claimed that Mr. Hawkins recanted his trial testimony in Appellant's case. The affidavits claim that the prisoners overheard Mr. Hawkins have a conversation with another inmate in which Mr. Hawkins stated that he had lied and been "`playing the prosecutor' in an attempt to get out of his trouble." In response, the State filed an affidavit of Mr. Hawkins in which he stated that he affirms his original testimony in all respects and denied making any statement that he had lied or played the prosecutor in order to get a lighter sentence. Additionally, he stated that his testimony had no effect on his jail terms or sentences and that he did not ask for any such consideration. Moreover, Mr. Hawkins stated that he had had several altercations with one of the prisoners who was claiming that he lied and that prisoner held a grudge against him for numerous reasons.
The trial court overruled the motion for a new trial. As a basis for denying the motions, the trial court pointed out that Mr. Hawkins was not before the court to recant his testimony but instead reaffirmed his prior statements. The trial court also noted that Mr. Hawkins had already served his full sentence before he testified at trial. The trial court found that the evidence could only merely attempt to impeach or contradict Mr. Hawkins' testimony. The trial court found that no strong probability existed that the alleged new evidence would alter the outcome of the trial if a new trial was granted.
Appellant argues that the trial court abused its discretion because it did not consider that although Mr. Hawkins had served his full sentence on his conviction at the time of trial, Mr. Hawkins had pending charges against him at the time of trial and eventually received time served on those charges. However, even with this consideration, we cannot say that the trial court was unreasonable. The facts remain that Mr. Hawkins had finished his sentence at the time he testified at trial and that he reaffirmed his testimony before the trial court. Additionally, Mr. Hawkins reiterated to the court that his testimony had no effect on his jail terms or sentences. We do not find that the trial court abused its discretion in overruling Appellant's motion for a new trial. Appellant's fifth assignment of error is without merit and overruled.
Appellant's sixth assignment of error:
 Appellant argues that the jury's verdict was against the manifest weight of the evidence and that the verdict was not based on sufficient evidence. We disagree.
When a conviction is challenged on appeal as being against the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."State v. Thompkins (1997), 78 Ohio St.3d 380, 387, 1997-Ohio-52,678 N.E.2d 541, citing State v. Martin (1983), 20 Ohio App.3d 172, 175,485 N.E.2d 717. A judgment should be reversed as being against the manifest weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction." Id. at 175.
In reviewing a challenge to the sufficiency of the evidence, we must determine whether any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found that the state had proven the essential elements of the crime beyond a reasonable doubt. See State v. Jenks (1991), 61 Ohio St.3d 259, 273, 574 N.E.2d 492.
An appellate court will defer to the trier of fact on determinations of witness credibility. State v. DeHass (1967) 10 Ohio St.2d 230. This includes determinations of expert witness credibility. State v. Rose,144 Ohio App.3d 58, 66, 2001-Ohio-3297, ¶ 38.
The State presented evidence that Appellant had motive to kill India and Cody. Appellant and Sue Neal had been having marital difficulties for several weeks preceding the disappearance of the children. (Tr. 3388-89). Appellant was highly upset about alleged infidelities by Sue Neal. (Tr. 3388-89; 3531-33, 3571). Appellant had told his sister-in-law that he would never visit her house because Sue Neal had "laid under another man" at her home. (Tr. 3571). Additionally, Appellant told a fellow inmate that he was interested in hurting Sue Neal rather than seeking revenge against the man with whom she was unfaithful. (Tr. 3535). Appellant then specified that the way to hurt someone is to hurt someone they loved. (Tr. 3533, 3535). Further, on the morning of the disappearance, Appellant and Sue Neal again argued and Sue Neal told Appellant that she thought they should be apart and that either he needed to leave or she and Cody were leaving. (Tr. 3389, 3512). This is bolstered by Appellant calling his aunt looking for a place to stay a few days. (Tr. 3390, 3510-11).
Further, the State presented credible evidence that Appellant had the best and only opportunity to commit the crimes. Appellant had told India to lay on the bed in the master bedroom that morning of the disappearance. (Tr. 3221; 3572). Later, India's blood was found on the comforter on the bed in the master bedroom. (Tr. 2176; 2386-89, 2693, 2695-96). Also, Appellant was home alone with the children after Sue Neal went to work on the morning of their disappearance. (Tr. 3220-23). Further, there was no evidence in the yard of children playing, such as toys, and neighbors testified that they had heard no children playing that day or anyone yelling for them. (Tr. 2763, 3109-58). One neighbor testified that he drove by the Neals' residence at 11:00 a.m. and 12:45 p.m. and saw no activity in the Neals' yard. (Tr. 3154). The drive from the Neals' residence to the location where the children's bodies were found normally took only fifteen minutes. (Tr. 3186). Also, Appellant's location cannot be confirmed between 6:30 a.m. to 8:51 a.m. and again from 10:00 a.m. to 1:52 p.m., when Appellant made the 911 call. (Tr. 3163-67). Finally, the deputy coroner for Montgomery County testified that it takes less than five minutes to kill someone by asphyxia. (Tr. 3002-3003). Although the coroner could not confirm the exact manner of death, the jury could have inferred that Appellant had sufficient time to kill the children, transport them to the cemetery, and then develop his story about the children disappearing.
Also, the State presented two witnesses who testified that between 1:00 p.m. and 1:30 p.m. on the day the children disappeared, the children, Appellant, and the maroon Bonneville were not present at the Neals' residence. (Tr. 3280, 3283, 3286-88, 3305, 3307-09). This was in contrast to Appellant's statement to the 9-1-1 dispatcher at 1:52 p.m. that he had spent the last 30 to 40 minutes looking for the children, including being outdoors yelling for them. (Tr. 2664, 2660-62). Appellant also reiterated this story by telling police officers that he had last seen the children playing outside at 1:15 p.m. and that he went outside to search for the children around 1:15 p.m. or later. (Tr. 2746; 3222). In addition, a mechanic testified that the maroon Bonneville could be driven despite its brake problems. (Tr. 3093-3095). Moreover, evidence was presented that the Bonneville had been driven recently and the vehicle was driven up to a tow truck. (Tr. 3091-92; 3432-33, 3472-74). This contradicted Appellant's statement that the vehicle had not been driven in over a month because of its faulty brakes. (Tr. 3014).
Moreover, the State presented credible physical and circumstantial evidence connecting Appellant to the location where the children's bodies were found. The State presented evidence that on Cody's blanket grass seeds were found which were the same type of seeds found where the children's bodies were located but were not the same as the seeds found outside the Neals' residence. (Tr. 2177-78; 2422-25, 2467, 2493, 2527, 2622-25). Although there was conflicting expert testimony, the jury was free to weigh the expert's credibility and believe the evidence of the State that the plant from which the seeds came was not present at the Neal residence in 1997 because of the low levels of rainfall that year, whereas the site where the bodies were found was near a water source. (Tr. 2521, 2639-42). Moreover, the jury could have reasonably concluded that the blanket was used to move the bodies and that the murder must have occurred before July 14, 1997, because that was when the blanket was found. (Tr. 2174, 2177-78). Also, Kentucky Bluegrass seeds were found on Appellant's jeans and the seeds at the site of the bodies matched the maturity of the seeds on Appellant's jeans, whereas the seeds at the Neals' residence were not sufficiently high to produce grass seeds of the maturity of those found on Appellant. (Tr. 2174-75, 2381, 2425, 2467, 2624, 2633-35).
Also, the entomological data, presented in the testimony of Dr. Haskell provided evidence to the jury that the children died between July 9 and July 14, 1997. (Tr. 13, 2859-65, 2879) (see also Tr. 2156-58, 2160, 2168, 2190-93, 2213). Since Appellant was not incarcerated until July 23, 1997, he was available to commit the murders. (Tr. 3338).Additionally, the fact that the children's bodies were found near the grave of Sue Neal's mother indicates Appellant's guilt. Appellant knew where Sue Neal's mother was buried. (Tr. 3359). The children's bodies were found less than a hundred feet from the grave of Sue Neal's mother. (Tr. 3442). Further, the manner in which the children were positioned, naked on their backs with their genital areas exposed, could have been reasonably interpreted by the jury as a personal insult to Sue Neal. (Tr. 2184-85, 2186-87, 2192, 3439-40.)
Appellant had informed police that he had no enemies, had heard no car pull onto the property, heard no screams for help from India and Cody, and that India would not get into a car with a stranger. (Tr. 3394-96). He had also told the police that he had placed on Cody a pair of black and white shoes with a Velcro strip. (Tr. 3349-50). The shoes were finally found on top of a trash pile behind the residence on August 2, 1997. (Tr. 3040-41). The area where the shoes were found had previously been searched with a canine unit on July 9 through July 14 and no shoes were present. (Tr. 3046-47). Appellant later identified the shoes as those that Cody had been wearing the day he disappeared. (Tr. 3353).
Also, the State presented competent, credible evidence demonstrating Appellant's guilty knowledge and feelings. A few weeks before the children's disappearance, Appellant told his cousin's wife that "it is easy to get rid of evidence." (Tr. 3326-27). Only seven days after the children disappeared, Appellant told his mother that he took the blame and wanted to kill himself. (Tr. 3555-56). Also, Appellant told his aunt that he had done something terrible and wanted to kill himself. (Tr. 3513). Only two days after the children had disappeared, Appellant told his sister-in-law that maybe he should confess but that "the only thing [he was] afraid of [was] the death penalty." (Tr. 3575). However, at only two days after the disappearance, no law enforcement officer suggested that a murder was suspected or discussed or suggested that the death penalty would be involved in the children's disappearance. (Tr. 2303-04, 2668, 3035, 3400). The jury could reasonably infer that the only reason Appellant was thinking about the death penalty was because he knew that the children were dead because he had killed them. Moreover, when Appellant was told that the children's bodies had been found, he showed no emotion and did not ask if the children were dead for some time, instead presuming that they were dead. (Tr. 3358-60).
Additionally, Appellant gave police and other investigators numerous false, contradictory and misleading information. At one point, Appellant insisted that he had called his ex-wife at 1:00 p.m. on the day of the children's disappearance, but there was no record of the call and his ex-wife stated that she was not at home at the time. (Tr. 3435, 3499-3501). Also, on the first day of the search, Appellant told investigators that no strange cars had pulled onto the property, but the next day, Appellant stated a blue Monte Carlo had pulled onto the property and gave a description of the occupants. (Tr. 3491-92). On the day of the children's disappearance, Appellant told his aunt that the reason she couldn't hear the children in the background as she normally would was because they were eating in the kitchen, but the Neals' kitchen did not have a table where the children could have been eating. (Tr. 3507, 3511-12, 3568). Appellant told the police that he and Sue Neal had a long discussion the morning of the disappearance, concerning his plans for the day with the children. (Tr. 2748-49). Yet, Appellant told his family that he and Sue Neal had had a bitter fight that morning over their infidelities and that she had wanted him to move out. (Tr. 3389, 3512). Finally, Appellant also told police that on the day of the disappearance, the children began playing around 12:30 p.m., that he saw them playing at 1:15 p.m. and then missed them around 1:30 p.m. Moments later, Appellant told police that he first noticed the children missing around 12:30 p.m. (Tr. 2746, 2749). Appellant's oral and written statements to law enforcement contained numerous other contradictions. (Tr. 2751-53).
The above listed evidence presented by the State amounts to competent, credible evidence from which the jury could conclude that Appellant caused the death of Cody and India with prior calculation and design and that the deaths were a part of a course of conduct of killing two or more persons. Additionally, the evidence listed above provided competent credible evidence that Appellant abused the corpses of India and Cody by treating them in a manner which would outrage reasonable family and community sensibilities. Finally, the State's evidence was competent credible evidence that Appellant tampered with the evidence in this case. Therefore, based on the evidence presented at trial, we cannot say that the jury clearly lost its way in convicting Appellant of two counts of aggravated murder, four counts of abuse of a corpse, and one count of tampering with evidence. Also, we cannot say that a reasonable juror viewing the evidence in a light most favorable to the State could not have found Appellant guilty beyond a reasonable doubt. Appellant's convictions were not against the manifest weight of the evidence or supported by insufficient evidence. Appellant's sixth assignment of error is without merit and overruled.
Appellant's first supplemental assignment of error:
 Appellant argues that the trial court committed prejudicial error when it permitted an alternate to retire with the jury for deliberations with the instruction not to participate in the deliberations over Appellant's objection. We disagree.
The Sixth Amendment to the U.S. Constitution and Article I, Section 10
of the Ohio Constitution guarantee a criminal defendant a trial by an impartial jury. When a guilty verdict is returned, that requires the jury's unanimous verdict to be the product of the deliberations of those who subscribe to it. When a stranger is admitted into the deliberation process, that requirement and the goal of a verdict rendered by an impartial jury is undermined. Crim. R. 24(F)(1) implements the constitutional right to an impartial jury by requiring the court to discharge any remaining alternate jurors when the jury retires to consider its verdict. The purpose of the rule is to prevent the alternate from adding his views and arguments during deliberations when he or she cannot join in the verdict. The Ohio Supreme Court has held that it is error for an alternate to be permitted to sit in during the jury deliberations, even if given instructions by the trial court not to participate in the deliberations. State v. Murphy, 91 Ohio St.3d 516,531-32, 2001-Ohio-112; State v. Jackson, 92 Ohio St.3d 436, 439,2001-Ohio-1266.
However, the Murphy Court held that this error does not amount to plain error if the defendant failed to raise an objection to the alternate's presence during jury deliberations. Id. at 533-34; see also, Jackson,supra at 439-440. In reaching its conclusion, the Murphy Court heavily relied on a similar U.S. Supreme Court case, United States v. Olano
(1993), 507 U.S. 725, 730, in which the Court addressed the error as a violation of Federal Rule of Criminal Procedure 24(C), which required alternates to be discharged after the jury retires to consider its verdict. Federal Rule of Criminal Procedure 24(C) is similar to Crim. R. 24(F), which provides, "[a]n alternate juror who does not replace a regular juror shall be discharged after the jury retires to consider its verdict." However in capital cases, it is permissible "for a court to retain alternates after the jury retired in the guilt phase and to substitute one of them for a regular juror who became incapacitated after the guilty verdict but before the jury retired to deliberate in the penalty phase." Murphy, supra at 531.
Certain fundamental constitutional errors known as structural errors are not subject to harmless error analysis. State v. Esparza,74 Ohio St.3d 660, 661, 1996-Ohio-233, citing Arizona v. Fulminante
(1991), 499 U.S. 279. Structural errors have been found to affect "the entire conduct of the trial from beginning to end" and "the framework within which the trial proceeds." Fulminante, supra at 309-310. Several courts in other jurisdictions have held that an alternate remaining with the jury during deliberations is a structural error and not subject to harmless error analysis. United States v. Beasley (C.A 10 1972),464 F.2d 468, 470; Commonwealth v. Krick (Penn. 1949), 67 A.2d 746, 749;Commonwealth v. Smith (Mass. 1988), 531 N.E.2d 556, 560; Brigman v.State (Okla.Cr. 1960), 350 P.2d 321, 323; State v. Bindyke (N.C. 1975),220 S.E.2d 521, 533.
However, the sixth federal circuit has held that the alternate juror is not a stranger in the jury room and that the alternate juror's presence in the jury deliberations does not amount to a structural error. Potterv. Perrini (1976), 545 F.2d 1048. Further, the seventh federal circuit has held that an alternate sitting in with the jury during deliberations was not structural error, but that "jury privacy is not a constitutional end in itself; it is, rather a means of insuring the integrity of the jury trial." Johnson v. Duckworth (1981), 650 F.2d 122, 125. Therefore, the defendant would need to show he was prejudiced by the violation of Crim. R. 24(F)(1) in order to merit setting aside the jury's verdict. SeeKoch v. Rist, 89 Ohio St.3d 250, 252, 2000-Ohio-149; State v. Hessler,90 Ohio St.3d 108, 2000-Ohio-30. Prejudice is not presumed merely because a stranger invades the sanctity of the jury deliberations. Rist, supra. The Duckworth court found that the alternate's presence during the jury deliberations was not the type of invasion of the jury's privacy that would tend to stifle the jury's debate and endanger the right to trial by jury. Id. at 125. The Duckworth court found that alternate jurors were particularly unique as they are indistinguishable from the other jurors in all aspects except being excluded from the deliberations and vote. Id. Thus, the alternate juror has no more and no less information than the other jurors and is neither more biased or unduly influenced than the other jurors. Id.
For all constitutional errors except for structural errors, in which an objection was properly lodged at trial, the reviewing court must apply Federal Criminal Rule 52(a)'s harmless error analysis and the court should disregard all errors which are harmless beyond a reasonable doubt. State v. Hill, 92 Ohio St.3d 191, 196-197, 2001-Ohio-141, citingCalifornia v. Chapman (1967), 386 U.S. 18, 24. Federal Criminal Rule 52(a) and Ohio's Crim. R. 52(a) both define the harmless error analysis as "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." To say that an error did not affect a substantial right is generally to say that the error was not prejudicial, meaning that it must not have affected the outcome of the proceedings. See Olano, supra at 734.
Further, Ohio's Evidence Rule 606(B) enacts the evidence "aliunde" doctrine, which holds that a jury's verdict may be impeached in situations where foundational evidence from sources other than the jurors themselves is presented which creates at least a prima facie case that extraneous prejudicial information was considered by the jury or that some external influence was brought to bear on the jury. Evid. R. 606(B) permits the court to inquire of the jurors concerning those matters but not as to any matter or statement occurring during deliberations or to the effect of anything on his mind or emotions that influenced his verdict. Additionally, Evid. R. 606(B) applies to alternate jurors as well. Hessler, supra at 123.
On appeal, Appellant urges this court to find that placing an alternate with a jury during deliberations amounts to a structural error and is not subject to harmless error analysis. However, the State asserts that although it was error to permit the alternate to remain with the jury for deliberations, this error was merely a trial error, not a structural error and thus subject to harmless error analysis. Further, the State argues that the error was harmless and that the verdict should not be reversed. We agree with the Duckworth court and find that allowing an alternate to be present during jury deliberations does not amount to a structural error but is a trial error subject to harmless error analysis.
The Ohio Supreme Court has recently held that the State has the burden to demonstrate an absence of prejudice when, over objection, alternates are present in jury deliberations. State v. Gross, 97 Ohio St.3d 121,2002-Ohio-5524, at 153. In arguing that the error here was harmless, the State predominantly relies on the presumption of regularity which presumes that jurors follow the instructions given them by the trial court to argue that no prejudice occurred as a result of the alternate's presence during the jury deliberations. In the case before us, unlike that in Gross, supra, there is no evidence that the alternate "inserted himself into the actual deliberations" (Id.) whether verbally or nonverbally. In Gross, the Supreme Court held that "reversible error occurs where, over objection, an alternate juror participates in jury deliberations resulting in an outcome adverse to a defendant." In Gross, there was "specific evidence of active disruption of deliberative process that poses a significant risk of affecting jury functions — a risk that carries presumptive prejudice that the State has failed to counter." Id., at 154. Since there is no evidence in the case before us that the alternate participated in any way in the jury's deliberations, we find the State has met its burden of proof, and the error is harmless beyond a reasonable doubt.
Appellant's second supplemental assignment of error:
 Appellant argues that he was rendered ineffective assistance of counsel by his counsel's failure to challenge Ms. Rosales as a juror after she stated that she believed Appellant to be guilty and by failing to request a hearing on Appellant's motion for a new trial. We disagree.
We reiterate for this assignment of error that we evaluate ineffective assistance of counsel arguments in light of the two prong analysis set forth in Strickland v. Washington (1984), 466 U.S. 668, 104 S.Ct. 2052. Trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. See id. at 2064-65. To reverse a conviction based on ineffective assistance of counsel, it must be demonstrated that trial counsel's conduct fell below an objective standard of reasonableness and that his errors were serious enough to create a reasonable probability that, but for the errors, the result of the trial would have been different. See id. at 2064. Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel. See id. at 2065. Debatable trial tactics and strategy do not constitute ineffective assistance of counsel. State v. Clayton (1980), 62 Ohio St.2d 45, 49.
Appellant asserts that he was rendered ineffective assistance of counsel because his counsel did not challenge for cause Ms. Rosales. Ms. Rosales stated that she believed Appellant was guilty of a crime, her sister had stated that she agreed with her, and she stated that sitting there that day she thought Appellant was guilty. Yet, Ms. Rosales continued on to state that she could set aside her belief of guilt and set aside any information she had received from media reports. (Tr. Vol. 8, 1847-48). Ms. Rosales also expressly stated under oath that she would be fair and impartial. (Tr. Vol. 8, 1848). Moreover, Ms. Rosales stated during voir dire that she was strongly troubled by the death penalty. Appellant's trial counsel specifically stated that he was not challenging for cause on Ms. Rosales solely because of his belief that she was unlikely to vote for the death penalty. (Tr. Vol. 9, 1870) We find that Appellant's counsel made a reasonable trial strategy in choosing to keep a juror with strong doubts about the death penalty who had some preconceived notions about the case, considering that the juror had stated that she could be fair and impartial. Further, Appellant's counsel alerted the court to his concerns and the trial court questioned Ms. Rosales at some length and determined that she could be fair and impartial. We cannot say that Appellant was rendered ineffective assistance of counsel because he did not challenge juror Rosales for cause.
Also, Appellant argues that he may have been prejudiced by his trial counsel's failure to request an evidentiary hearing on Appellant's motion for a new trial. Appellant does not assert what new evidence would have been offered at a formal hearing other than what was presented with the motion. Additionally, we have determined above that the trial court did not err in overruling Appellant's motion for a new trial. We do not see how the outcome of the new trial proceeding would have been different if Appellant's trial counsel had requested an evidentiary hearing. Appellant was not rendered ineffective assistance of counsel by his counsel's failure to request the hearing. Appellant's second supplemental assignment of error is without merit and is overruled.
Appellant's third supplemental assignment of error:
 Appellant argues that the trial court erred in admitting several pieces of evidence that were admitted over objection. We disagree.
Appellant first argues that the trial court erroneously allowed a letter to go back with the jury at the close of trial which was purportedly written by Appellant and found by a detective in the maroon Bonneville. The State concedes that it was error to admit the letter without authenticating the letter, which it failed to do at trial. However, the State asserts and we agree that this merely amounted to harmless error. The State never again mentioned the letter at trial nor referred to it during closing arguments. Additionally, the State presented significant evidence of Appellant's guilt.
Appellant also argues that the trial court erred in admitting into evidence a consent to search form which referred to items which were not found at the Neals' residence. The State argues that the consent to search form was relevant to demonstrate that the police had thoroughly considered all alternatives. The consent form describing items which were not found could not have harmed Appellant or prejudiced the jury. The trial court did not err in admitting the consent form.
Additionally, Appellant argues that the State asked an improper question on cross examination of a defense expert. Appellant argues that it is error for a prosecutor to comment on the absence of a written report from a defense expert and cites State v. Fears, 86 Ohio St.3d 329,334-35, 1999-Ohio-111, in support. However, the Fears case merely states that defense counsel objected to the prosecutor's comment and the objection was sustained. Id. The case does not opine on the propriety of the statement. Id. In the instant case, Appellant's expert not only commented on the state's expert's work but reached a conclusion of his own as to the likely time of death. The prosecutor on cross examination merely pointed out that the State had not received a report from the defense expert and thus the State's expert could not give an opinion on the defense expert's findings. (Tr. 3899-3900). The prosecution was pointing out the limits of the defense expert's testimony, specifically the lack of his own work on the issue. Additionally, the prosecutor was pointing out that there was no written analysis of how the defense expert arrived at his conclusion that would be equal in persuasion to the State's expert's reports. We find that it was within the trial court's discretion to permit this form of cross-examination.
Appellant further argues that the trial court erred in admitting hearsay testimony by Anne Daniel, a witness for the State, in which she stated that she conferred with a Dr. Twig, who confirmed her conclusions about the dormancy of plants. The trial court stated about the Dr. Twig testimony, "The State was allowed to ask her what general sources of knowledge she turned to to bolster her opinion, and you proceeded to lead her into talking about Dr. Twig. That was a no no." (Tr. 2602). We agree with the trial court. Ms. Daniels' testimony referred to Dr. Twig as a means of showing what her basis of knowledge was and what sources she sought out to confirm her findings. We cannot say that the trial court abused its discretion in failing to strike her testimony in which she stated she had confirmed her results with Dr. Twig and manuals.
Appellant argues that the trial court improperly allowed Detective Gould to testify regarding a conversation she had with Sue Neal. At trial, Detective Gould stated that she had received information from Sergeant Stroud which led her to discuss the status of the Neals' marital relationship with Sue Neal. (Tr. 3171). The detective then continued on to state that Sue Neal confirmed what the detective had learned from Sergeant Stroud. (Id.) As stated in Appellant's fourth assignment of error, in order for testimony to be hearsay, it must contain a statement. Detective Gould's testimony only states that Sue Neal confirmed information she had learned from another source. Detective Gould does not continue on to state what the information was or provide any further details of the conversation with Sue Neal. We do not think the trial court abused its discretion in overruling the defense objection to the statement.
Also, Appellant asserts that the trial court erred in permitting Detective Gould to testify that she obtained affidavits from Libby Wyatt and Carolyn Gragg and in admitting the affidavits into evidence. Detective Gould testified that she interviewed Ms. Wyatt, who stated that she had a conversation with Appellant and Sue Neal the previous day, and as a result of the interview, she had Ms. Wyatt sign an affidavit. (Tr. 3172). Additionally, Detective Gould testified that she was the notary for another affidavit executed by Carolyn Gragg. (Tr. 3174). Appellant argues that Detective Gould testified about her interviews with Ms. Wyatt and Ms. Gragg and their conversations with the Neals. However, Detective Gould's testimony does not relate statements by Ms. Wyatt or Ms. Gragg about their conversations with the Neals. As the testimony does not relate an out of court statement, it was not hearsay and the trial court did not err in overruling the defense counsel's objection to the testimony.
As for the affidavits of Ms. Wyatt and Ms. Gragg, Appellant argues that the affidavits amounted to inadmissible hearsay and should not have been admitted into evidence. Appellant additionally notes that Ms. Wyatt's affidavit references polygraph examinations taken by Appellant and Sue Neal. The State asserts that both Ms. Wyatt and Ms. Gragg provided testimony identifying the affidavits and their signature on the documents. The State asserts that the documents are not hearsay because they were not used to prove the truth of the matter asserted but to show the nature of the police investigation and to show the basis for the search warrant issued in the case. We agree that the affidavits amounted to hearsay and should not have been admitted and sent back to the jury for deliberations. However, the State asserts that the affidavits were harmless because both Ms. Wyatt and Ms. Gragg provided testimony in which they reiterated what was in their affidavits. The only item mentioned in either of the affidavits which was not testified to was a brief statement in Ms. Wyatt's affidavit in which she stated that Appellant told her that during his polygraph the examiner asked him if Sue Neal or himself had anything to do with the disappearance of the children to which he responded that they did not. We agree with the State and find that this one statement in light of the significant evidence presented against Appellant amounted to merely harmless error.
Appellant also claims that the trial court permitted improper hearsay testimony in the form of Sheriff Deskins' testimony that Sue Neal's position of support towards Appellant had waffled throughout the investigation. Sheriff Deskins testified regarding Ms. Neal's outburst the day she found out her children were missing. The Sheriff described the outburst as accusatory. The prosecutor then asked if Sue Neal's position had changed throughout the investigation and the witness replied that she was generally supportive of Appellant but that she had waffled in her support. (Tr. 3387). The State argues that this is not an out of court statement by Ms. Neal but a description of her attitude throughout the investigation and of her willingness to be cooperative. We do not find that the Sheriff was relating a statement by Sue Neal or that the statement was being offered for the truth of the matter asserted. Therefore, we do not find that the trial court erred in overruling Appellant's objection to this testimony as it was not hearsay.
Finally, Appellant argues that the trial court permitted hearsay testimony in the form of Mr. Hawkins' testimony in which he related a previous statement he made to Officer Atwood in the Shelby County Jail. The following exchange occurred at trial:
 "[Mr. Hawkins:] * * * And then after I was in the county jail and Shelby County I seen Kevin Neal on TV and I just, I just — I asked — I told the deputies about it and everything that he was telling me.
 "[Prosecutor:] What, what deputy did you tell and what would you have told them?
 "[Mr. Hawkins:] Officer Atwood. I told him that I think that Kevin Neal killed —
"[Defense counsel:] Objection. * * *". (Tr. 3536).
The trial court overruled the objection. The State argues this was not hearsay because it was not offered to prove the truth of the matter asserted but to demonstrate that the testimony was not recently concocted but was a reaction to news on the television. We find that Mr. Hawkins' testimony was directly responsive to the prosecutor's question and therefore, that the State sought to elicit Mr. Hawkins' previous statement to the deputy. We cannot agree with the State that the statement was elicited with no intent to prove the truth of the matter asserted, specifically that in Mr. Hawkins' opinion Appellant had killed the children. However, we find that the error was harmless in light of Mr. Hawkins' legitimate testimony as to Appellant's incriminating statement and the other substanital evidence demonstrating Appellant's guilt. Appellant's third supplemental assignment of error is without merit and is overruled.
Appellant's fourth supplemental assignment of error:
 Appellant argues that he is entitled to a new trial based on the cumulative error which occurred during his trial. We disagree.
The Ohio Supreme Court has stated, "[a]lthough violations of the Rules of Evidence during trial, singularly, may not rise to the level of prejudicial error, a conviction will be reversed where the cumulative effect of the errors deprives a defendant of the constitutional right to a fair trial." State v. DeMarco (1987), 31 Ohio St.3d 191, syllabus. The Court has expanded this rule to include the cumulative effect of all errors, not just evidentiary errors. State v. Garner, 74 Ohio St.3d 49,64, 1995-Ohio-168.
Appellant argues that he raised numerous errors that occurred at trial and that the cumulative effect of these errors warrants a reversal. This Court only found a few errors committed by the trial court. In light of the substantial evidence presented by the State at trial indicating Appellant's guilt, we find that Appellant received a fair trial and any errors committed were harmless cumulatively, as well as individually. Appellant's fourth supplemental assignment of error is without merit and is overruled.
The judgment of the trial court is affirmed.
WOLFF, P.J. and GRADY, J., concur.
[1] In the interest of clarity, the children will hereinafter be referred to by their first names.